UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

PATRICK BROWN, ET AL.              CIVIL ACTION NO. 04-0759-A

VS.                                SECTION P

TOM RIDGE, ET AL.                  JUDGE DRELL

                                   MAGISTRATE JUDGE KIRK

## REPORT AND RECOMMENDATION

Before the court is a civil rights complaint[1] filed *in forma paupieris* by or on behalf of the following plaintiffs: (1) Patrick L. Brown, (2) Fredo Gustave, (3) Ismael (or Ismet) Karaca, (4) Eric Bell, (5) Ramit Narang, (6) Franklin Moreno, (7) Leroy Bacchus, (8) Rafiu Abimbola, (9) Prince C. Brown, (10) Gervase Blackwood, (11) Hussein Nasrallah, (12) Augusto Moreira, (13) Alexander W. Ndaula, and (14) Curtis Banks.

The original complaint appears to have been signed by all

---

[1] Plaintiffs named federal agents as defendants (then Department of Homeland Security (DHS) Secretary Tom Ridge, the DHS/Immigration and Customs Enforcement (ICE) District Director, Christine Davis, and Nancy L. Hooks, the Officer in Charge, DHS-Oakdale); consequently, this action, as it relates to these federal defendants is construed to be a civil rights claim filed pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Plaintiffs also named the Concordia Parish Sheriff's Office, the Concordia Parish Correctional Facility (CPCF), its Warden, and Chief of Security. Since these defendants are named as "state actors," plaintiffs' civil rights claims against these defendants arise under the provisions of 42 U.S.C. § 1983. Further, by order dated September 30, 2005, the claims against the Concordia Parish Sheriff's Department were dismissed with prejudice. [Doc. 97-1]

plaintiffs on February 14, 2004 and received and filed on March 29, 2004.[2]

At the time the complaint was filed, all plaintiffs were immigration detainees in the custody of the Department of Homeland Security/Immigration and Customs Enforcement (DHS/ICE); all were detained at the Concordia Parish Correctional Facility, Phase II (CPCF-II). All claims for relief related to their confinement at CPCF-II. However, in an objection to a previous Report and Recommendation, plaintiff **Alexander Ndaula** broadened the scope of his complaint alleging, "...there's a continuing injury and live controversy where BICE officials continue the mistreatment in other detention centers and a grant of relief against ICE officials would cure the mistreatment and constitutional violations stated." [Doc. 48, p. 5]

### STATEMENT OF THE CASE

### 1. The Original Complaint and Attachments [Doc. 1]

In the original complaint, plaintiffs made the following claims for relief:

Plaintiffs claimed to have been housed at CPCF-II under "sub

---

[2] As is shown hereinafter, plaintiff **Gervase Blackwood** filed a Motion to Withdraw alleging that "...his co-detainees without his knowledge had added his name into this class action suit." [Doc. 36] His Motion to Withdraw was granted on May 28, 2004. [Doc. 37] Further, plaintiff **Ismet** or **Ismael Karaca** filed a Motion to dismiss suggesting that he, too, had not consented to be a plaintiff in this action. This motion was granted on May 13, 2004. [See Docs. 29, 33]

human" conditions and in violation of DHS/ICE standards. The
DHS/ICE Standards alleged to have been violated were articulated
as follows: Plaintiffs were being housed with state inmates who
were "awaiting to serve long criminal sentences." Plaintiffs were
denied their one-hour per day access to a law library, access to
sufficient typewriters and computers, access to sufficient and
updated legal materials, and, plaintiffs were required to submit
their legal materials to an inmate counsel in violation of the
"Privacy Act." Further, plaintiffs complained that they were not
provided clean, unstained sheets. [Doc. 1, paragraph IV]

In an attachment to the complaint,[3] plaintiffs alleged the
following:

## A. Access to the Courts/Law Library
[Doc. 1, attachment, p. 1]

Plaintiffs reiterated their access to the courts claim and
asserted that the CPCF-II Law Library was inadequate; that they
were denied access to the library; that they were denied paper
and pen to draft legal documents; and, that consequently, the
defendants had violated their rights of access to the courts in
violation of the First and Fourteenth Amendments.

## B. Denial of the Right to Religious Freedom [Id., p. 2]

Plaintiffs claimed that CPCF-II authorities denied non-
Christian inmates rights to freely exercise their religion.

---

[3] The attachment is signed only by plaintiff **Patrick L. Brown**. [Doc.1, attachment, p. 9]

Specifically, plaintiffs alleged that detainees **Eric Bell** and **Patrick Brown** had been placed in Administrative Segregation because they refused to cut their hair. (**Bell** and **Brown** contend that as members of the Rastafarian religion, they abide by a "no hair cut policy.")

Plaintiffs also contended that detainee Nico Benn was kept in Administrative Segregation because he refused to shave his beard. (Benn is alleged to be a Sunni Muslim; his religious beliefs prohibit him from cutting his beard. Benn, of course, did not sign the pleading and is not a party to this lawsuit.)

Plaintiffs claimed that the defendants "fail to permit Muslim inmates to congregate on Fridays for 'Jumah Prayer' Service."

### C. Denial of First Amendment Right to the Press [Id. at p. 3]

Plaintiffs claimed that the defendants have circulated a memorandum which purports to ban "all publications from the holding center."

### D. Conditions of Confinement [Id. at p. 5]

Plaintiffs claimed that CPCF-II had no "sheet exchange program" and that inmate laundry was not properly laundered Consequently, the sheets and towels provided to inmates were alleged to be discolored.

Plaintiffs also claimed that their living quarters were

unsanitary; that they were not allowed sufficient recreation; that they were exposed to environmental tobacco smoke; that they were provided only three toilets and one shower for sixty inmates; and, that CPCF-II offered no "extra-curricular activities."

## E. Retaliation for Exercise of Rights to Judicial Review [Id., p. 6]

Plaintiffs claimed that the "majority of the INS detainees... are currently in the middle of the Judicial Reviews of ... final orders of deportation." They claimed that they were transferred from Federal Detention Centers, where they had access to adequate law libraries and legal materials, to CPCF-II as retaliation for asserting their rights in immigration proceedings.

Plaintiffs claimed that inmate **Abimbola**, who served as inmate counsel for the immigration detainees was relieved of his job as retaliation for his complaints concerning the inadequacies of the law library.

## F. Physical and Verbal Assault on Detainees [Id. p. 7]

Plaintiffs claimed that detainee Norman Butte (who is not a plaintiff in this action) was physically assaulted by an unnamed corrections officer, and that detainee Gregario Machvado (who is also not a plaintiff in this action) was badly beaten by state inmates.

Plaintiffs claimed that **Gervaise Blackwood** (a named plaintiff who subsequently withdrew from the litigation) was verbally abused when he requested a vegetarian diet in accordance with this religious beliefs; **Blackwood** was also denied a meal.

Plaintiffs claimed that **Hussein Nasrallah** (a named plaintiff) was refused a copy of the Koran by the prison chaplain. The chaplain also disparaged **Nasralla's** religion and beliefs.

## G. Plaintiffs' Prayer for Relief
### [Doc. 1, paragraph V and Attachment, p.8]

In the original complaint, plaintiffs prayed for an order compelling the defendants to meet detention standards and to provide all basic needs, or, in the alternative, for an order compelling defendants to house all detainees at a "qualified detention center."

In the attachment to the complaint, plaintiffs prayed for an injunction compelling the defendants to either comply with the standards listed in the INS Detention Standard Manual or transfer of the plaintiffs to a federal or local facility that meets those standards.

Plaintiffs also prayed for "nominal punitive damages of $5.00 to each plaintiff." Finally, plaintiffs prayed for an order directing the defendants to release **Patrick Brown**, **Eric Bell** and Nico Benn from Administrative Segregation.

## 2. Motion for Class Certification [Doc. 3]

On March 29, 2004, plaintiff **Patrick Brown** filed a Motion for Class Certification. Therein plaintiff sought certification of a class of persons similarly situated who, "either now, or in the future will be, incarcerated in Concordia Parish Correctional Facility..." Plaintiff estimated that the class would number approximately two hundred and that the questions of law and fact presented would be common to the entire class. **Brown** alleged that the plaintiff class would consist of "detained aliens in the United States" who "are incarcerated at the Concordia Parish Correctional Facility..." **Brown** also sought to join as a defendant, Craig Robinson, the "duly appointed and acting New Orleans Field Office Director for Detention and Removal..."

**Brown** contended that the defendants (those named in the original complaint and Robinson) "have promulgated through their contracted agent, the Concordia Parish Correctional Facility Warden's Office, certain Rules and Regulations relating to the access of prisoners to law books, confinement conditions and communication and/or access to the courts."

Finally, **Brown** prayed for injunctive relief, costs, and attorney's fees.

### 3. The Current Status of the Plaintiffs

The following plaintiffs have notified the court that they are either no longer detained at CPCF-II, or wish to withdraw

from this litigation:

a. On April 26, 2004, **Patrick Brown** advised that he was being detained at the Etowah County Detention Center, Gadsden, Alabama. [Doc. 19] By January 26, 2005, **Brown** had been transferred to the Federal Detention Center, Oakdale, (FDCO) Louisiana. [Doc. 73] It appears that he remains detained at that facility as of the date of this writing.

b. On April 21, 2004, **Eric Bell** advised that he was being detained at the Etowah County Detention Center (ECDC), Gadsden, Alabama. [Doc. 20]

c. On the same date, **Hussein Nasrallah** submitted his *in forma pauperis* application, therein indicating that he is now detained at the ECDC, Gadsden, Alabama. [Doc. 17]

d. On April 29, 2004, **Rafiu Abimbola** advised that he was being detained at the ECDC, Gadsden, Alabama. [Doc. 23] The available evidence suggests that he is still being detained there.

e. On April 29, 2004, **Alexander W. Ndaula** submitted his *in forma pauperis* application, therein indicating that he was being detained at the ECDC, Gadsden, Alabama. [Doc. 25] On September 15, 2004 he submitted a pleading and correspondence providing the following address, 454 Pleasant Street, No. 3, Worcester, Massachusetts. [Doc. 44] On January 3, 2005, he advised the court that the Worcester, Massachusetts address was still valid,

however, his correspondence reflected the following return address, "Alexander (Malik) Ndaula/National Immigration Project/National Lawyers Guild, Inc./14 Beacon St., Suite 602, Boston, Mass. 01208." [Doc. 66] **Ndaula** is no longer in the physical custody of DHS/ICE.[4]

f. On April 29, 2004, **Augusto Moreira** advised that he was being detained at the ECDC, Gadsden, Alabama. [Doc. 26] It appears that he remains in custody at that facility.

g. On April 30, 2004, **Prince C. Brown** provided evidence that he is now detained at the FDCO, Oakdale, Louisiana. [Doc. 28; 34] It appears that he remains in custody at that institution.

h. On May 5, 2004, plaintiff **Ismael Karaca** filed a Motion which indicated that he was not a party to this litigation. [Doc. 29] On May 13, 2004, his Motion to Dismiss was granted and he was dismissed from the complaint. [Doc. 33]

i. On May 25, 2004, **Gervase Blackwood** filed a Motion to Withdraw alleging that "...his co-detainees without his knowledge had added his name into this class action suit." [Doc. 36] His Motion to Withdraw was granted on May 28, 2004. [Doc. 37]

j. On May 24, 2004, **Leroy Bacchus** submitted his *in forma*

---

[4] See "Holding the Immigration System Accountable," at http://www.nationalimmigrationproject.org/Press/ System%20Accountable.htm, "The small town of Oakdale Louisiana, where Ndaula was held for 3 years (finally securing his release in May 2004)...."

*pauperis* application, therein indicating that he is now detained at the ECDC, Gadsden, Alabama. [Doc. 38]

k. On May 20 and 21, 2004, court documents sent to **Ramit Narang, Curtis Banks, Franklin Moreno**, and **Fredo Gustavo** at CPCF-II were returned with the notation that these detainees were no longer incarcerated at the facility. [See docket sheet, following Doc. 35]

Subsequently, it was discovered that **Curtis Banks** and **Franklin Moreno** were being detained at the ECDC, Gadsden, Alabama.

By judgment dated May 13, 2004, plaintiff **Ismael (Ismet) Karaca's** complaint was voluntarily dismissed. [Doc. 33] On May 28, 2004, plaintiff **Gervase Blackwood's** complaint was voluntarily dimissed. [Doc. 37]

Finally, on September 30, 2005, plaintiffs **Fredo Gustave, Eric Bell, Ramit Narang, Leroy Bacchus,** and **Hussein Nasrallah** were dismissed without prejudice for failing to keep the court apprised of their whereabouts. [Doc. 97-1]

Therefore, only the claims of the following plaintiffs remain viable:

1. **Patrick L. Brown** (FDCO, Oakdale, Louisiana);

2. **Franklin Moreno** (ECDC, Gadsden, Alabama);

3. **Rafiu Abimbola** (ECDC, Gadsden, Alabama);

4. **Prince Brown** (FDC, Oakdale, Oakdale, Louisiana);

5. **Augusto Moreira**, (ECDC, Gadsden, Alabama);

6. **Alexander W. Ndaula**, (who is not in custody and resides in Boston and/or Worcester, Mass.);

7. **Curtis Banks**, (ECDC, Gadsden, Alabama).

As can be seen, none of the plaintiffs are currently detained at the CPCF-II.

**PROCEDURAL CHRONOLOGY**

**A. First Report and Recommendation [Doc. 41]**

In the original Report and Recommendation dated July 26, 2004 [Doc. 41], the undersigned recommended dismissal of the complaint and in so doing made the following observations:

**1. Mootness**

Since none of the remaining plaintiffs remained in detention at the CPCF-II as of July, 2004, the undersigned recommended dismissal of their claims for declaratory and injunctive relief as moot and cited Herman v. Holiday, 238 F.3d 660, 665 (5th Cir.2001) and  Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir.1988) as support for the recommendation.

Further, the undersigned noted: "The transfer of a prisoner out of an institution often will render his claims for injunctive relief moot" unless he "can show either a 'demonstrated probability' or a 'reasonable expectation' that he will be transferred back to the facility." Oliver v. Scott, 276 F.3d 736,

741 (5th Cir.2002) (quoting Murphy v. Hunt, 455 U.S. 478, 482,
102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). The undersigned also
cited Edwards v. Johnson, 209 F.3d 772, 776 (5th Cir. 2000) for
the proposition that an alien detainee's claims for injunctive
relief intended to correct policies and practices at particular
detention center were rendered moot when he was transferred out
of that center.

### 2. Access to the Courts/Law Library

With regard to the access to courts claim, the undersigned,
citing Lewis v. Casey, 518 U.S. 343, 348, 116 S.Ct. 2174, 2178,
135 L.Ed.2d 606 (1996), recommended dismissal of the claims
because plaintiffs had failed to show that the actions of the
defendants resulted in an actual injury, that is "actual
prejudice with respect to contemplated or existing litigation,
such as the inability to meet a filing deadline or to present a
claim." Further, the undersigned, again citing Lewis v. Casey,
opined that in order to prevail on their access to courts claim,
the plaintiffs must identify a "nonfrivolous," "arguable"
underlying claim which has been "frustrated or was being
impeded.". Id. at 353.

### 3. Denial of the Right to Religious Freedom

Citing Diaz v. Collins, 114 F.3d 69, 72-73 (5th Cir. 1997);
Harris v. Chapman, 97 F.3d 499 (11th Cir.1996); Hamilton v.
Schriro, 74 F.3d 1545 (8th Cir.1996); and O'Lone v. Estate of

Shabazz, 482 U.S. 342, 351-352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the undersigned recommended dismissal of plaintiffs' free exercise of religion claims.

### 4. Denial of First Amendment Right to the Press

In recommending denial of plaintiffs' First Amendment, free press/speech claim the undersigned recommended dismissal because the plaintiffs failed to allege that any particular publications were censored and instead, merely referred to a memorandum suggesting that publications would be banned. The undersigned further noted that to the extent that the "memo" in question had been implemented, plaintiffs arguably stated a claim for which relief may be granted; however, plaintiffs did not amend their pleadings to provide those factual allegations necessary to support this claim. As noted, since constitutional violations do not exist in a vacuum, civil rights plaintiffs must always allege, in addition to the fault of the defendant, some prejudice suffered as a result of that fault. Since none of the plaintiffs alleged the unwarranted censorship of a particular publication, it was recommended that this claim be dismissed.

### 5. Conditions of Confinement

The undersigned recommended dismissal of plaintiffs' complaint about unsanitary or unhealthy conditions of confinement and noted, the appropriate standards for judging conditions of confinement cases raised by detainees. The undersigned further

noted that when an individual government official is sued for a specific act or omission, the detainee-plaintiff must allege and establish that the named defendant acted with subjective deliberate indifference to prove a violation of his constitutional rights. Finally, noting that the Fourteenth Amendment prohibits detainees from being held under inhumane conditions, and mindful of the appropriate jurisprudence, the undersigned concluded that plaintiffs' allegations did not suggest that these plaintiffs were forced to endure such inhumane conditions.

## 6. **Retaliation**

Plaintiffs' contention that their transfer to CPCF-II was an act of retaliation by DHS/ICE officials was also determined to be without any basis in fact or law. The undersigned noted, "To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." Jones v. Greninger, 188 F.3d at 324-25. "[I]f the [prisoner] is unable to point to a specific constitutional right that has been violated, the claim will fail." Id. at 325. "The [prisoner] must allege more than his personal belief that he is the victim of retaliation," id.; rather, he "must produce direct evidence of motivation or, the more probable scenario, 'allege a

chronology of events from which retaliation may plausibly be inferred[,]'" Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995) (quoting Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir.1988)). Finally, "causation" requires the prisoner to show that "but for the retaliatory motive the complained of incident ... would not have occurred." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir.1997). "This places a significant burden on the [prisoner]." *Woods v. Smith*, 60 F.3d at 1166.

Dismissal of the retaliation claims was recommended because the plaintiffs offered only their conclusory opinions that the defendants had a retaliatory motive.

### 7. Physical and Verbal Abuse

The undersigned recommended dismissal of plaintiffs' claims of physical and verbal abuse with respect to their fellow detainees, Norman Butte and Gregario Machvado because neither detainee were parties to the suit.

### 8. Class Action Certification

Finally, the undersigned recommended that the Motion for Class Action Certification be denied for a variety of reasons. This recommendation was ultimately accepted by the Court.

### B. Plaintiffs' (Abimbola and Ndaula) Objections to the First Report and Recommendation [Docs. 42, 43, 44, 45, and 48]

On August 9, 2004, plaintiff **Rafiu Abimbola** filed a Motion seeking an extension of time to file objections to the Report and

Recommendation. [Doc. 42] On August 12, 2004, plaintiff's motion was granted and he was told to file his objections by September 12, 2004. [Doc. 43] However, plaintiff **Abimbola** did not file an objection.

On September 15, 2004, plaintiff **Alexander W. Ndaula** filed a motion seeking additional time to file his objections to the Report and Recommendation. [Doc. 44] On September 21, 2004, **Ndaula's** motion was granted and he was given until October 23, 2004 to file objections. [Doc. 45] A second request resulted in an extension until November 23, 2004. [Docs. 46-47]

On October 22, 2004 plaintiff **Ndaula** filed an opposition to the Report and Recommendation. [Doc. 48] The objections were set forth under seven headings, summarized as follows:

I. Discussion - **Ndaula** argued, "Plaintiffs' claims principally seek damages for violations of their First and Fifth Amendment Rights."

II. Analysis - Citing <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), at p. 521, **Ndaula** argued that the plaintiffs' claims should not be dismissed on initial review without first affording them the opportunity to present evidence in support of their claims, or, at the least, an opportunity to amend the complaint to cure the deficiencies noted in the Report and Recommendation. Additionally, **Ndaula** observed, "...this suit does not target CPCF as the exclusive defendant, rather it entails general detention

practices of the DHS."

III. Mootness – **Ndaula** objected to the Report insofar as it recommended dismissal of the claims as moot because none of the plaintiffs were being detained at CPCF. **Ndaula** argued that identical or at least similar conditions of confinement were encountered by all of the plaintiffs who were transferred to the ECDC in Alabama and that the DHS/ICE officials named as defendants were responsible for this general policy of transferring immigration detainees to sub-standard facilities. **Ndaula** also argued in favor of class certification as to this issue. **Ndaula** further observed, "The mere fact that this complaint was filed at the CPCF facility, does not on its own imply in any sense that this action seeks only relief against CPCF officials... The complaint is a direct attack on detention practices the agency enforces countrywide with specificity to facilities in the south."

IV. Right of Access to the Courts and Right of Counsel – **Ndaula** argued that "...Defendants undertook a wide variety of measures to deny Plaintiffs access to counsel and the courts, from an initial communications blackout, to highly restrictive limits on phone calls and visits with attorneys thereafter, to falsely denying that individuals were in Defendants' custody at all, to denying bond without supporting evidence and seeking continuances to delay review of detention where no DHS officials

went so far as to deceive detainees into forgoing calls to attorneys..."

He concluded by arguing that there was no need to show actual injury in order to prevail on an access to court claim.

V. Conditions of Confinement – **Ndaula** argued that the cases cited in the Report and Recommendation "concerned facilities that markedly facilitate a different class of prisoners to the alien detainees seeking class certification here. The CPCF-II and other contract facilities ... involve traditional jails and cells in which 'inmates' and detainees were locked during most of the day. Given this factual disparity, they have little or no application to the case at hand... The analysis fails to scrutinize the particulars of the facilities as related to the designs and concept in question, and does not explain how and why it would be of no consequence to discuss them..."

**Ndaula** also argued that the plaintiffs should be allowed to amend their complaint to request more than nominal damages for the harm suffered as a result of their exposure to the conditions of confinement complained of at CPCF-II.

VI. Free Exercise of Religion – **Ndaula** claimed that the grooming policies complained of at CMDC-II were unconstitutional as applied to immigration detainees because they present less of a security threat than do convicts. Further he noted, "The key to the issues in this complaint is to bring some legal light to the

practices fostered by ICE officials in the many contract detention facilities housing ICE prisoners." **Ndaula** also argued that the Report's analysis of the Jumuah Prayer Service issue was without merit since the facility in question did provide such accommodations to its Christian detainees and prisoners.

VII. Retaliation and Intimidation - **Ndaula** argued that the Report and Recommendation was in error insofar as it concluded that plaintiffs had failed to articulate a chronology of events from which retaliation could be inferred.

### C. Judge Drell's Order [Doc. 49]

On November 9, 2004, Judge Drell signed an order which stated, "This matter is referred to Magistrate Judge James D. Kirk for further analysis in light of Plaintiffs' Memorandum in Objection to the Magistrate Judge's Report and Recommendation to Dismiss (Document No. 48)."

### D. Second Report and Recommendation [Doc. 50]

On December 1, 2004, the undersigned authored another Report and Recommendation which:

1. Recommended dismissal of the claims of plaintiffs **Fredo Gustave, Ramit Narang, Franklin Moreno**, and **Curtis Banks** because of their failure to submit either a filing fee or an *IFP* Application [Doc. 50, p. 2];

2. Recommended dismissal of the claims of plaintiffs **Eric Bell, Fredo Gustave, Ramit Narang, Franklin Moreno, Hussein**

**Nasrallah, Patrick L. Brown, Curtis Banks, Augusto Moreira, Leroy Bacchus,** and **Hussein Nasrallah** for their violation of Local Rule 41.3-W in that they had not apprised the court of their whereabouts following transfer from CPCF-II [id., pp. 2-3];

3. Recommended dismissal of the claims of plaintiff **Rafiu Abimbola** due to his failure to file an objection to the First Report and Recommendation [id., p. 3]; and,

4. Recommended dismissal of all plaintiffs' claims due to their failure to exhaust available administrative remedies [id.]; and,

5. Noted that only plaintiff **Ndaula** had objected to the First Report and Recommendation and that although he purported to be a representative of all of the plaintiffs, he could not appear in that capacity since he is not an attorney [id., p. 5-6]; and,

6. Recommended dismissal of **Ndaula's** claims because "none of the claims [alleged in the pleadings] cite[d] specific instances of violations of **Ndaula's** constitutional rights by the named defendants, or actual injuries suffered by **Ndaula**..."; [id., pp. 7-8] and,

7. Recommended dismissal of the Concordia Parish Sheriff's Office as a defendant since the Sheriff's Department is not a "person" capable of being sued under Louisiana law. [id., pp. 8-9]

**E. Plaintiffs' Objections and Motions and
Orders and Judgments
[Docs. 51, 59, 66, 69, 70, 71, 73, 75, 76, 77, 78,
82, 84, 88, 92, 93, 94, 95, 96]**

On December 20, 2004, plaintiff **Rafiu Abimbola** filed a
Motion for an Extension of Time to file an objection to the
Report and Recommendation. [Doc. 51] His motion was granted on
December 22, 2004, and he was ordered to file his objections
before January, 11, 2005. [Doc. 59] On January 10, Abimbola filed
another request for an extension [Doc. 69] and he was given until
February 10, 2005 to file his objections. [Doc. 71]

On January 3, 2005, plaintiff **Alexander Ndaula** also filed a
Motion for an Extension of Time to file an objection. [Doc. 66]
On January 13, 2005, this motion was granted and he was ordered
to file his objections by February 7, 2005. [Doc. 70]

On January 26, 2005, plaintiff **Patrick L. Brown** filed a
Motion to Dismiss his complaint. [Doc. 73] On February 2, 2005,
the undersigned authored a Report recommending that **Brown's**
request for voluntary dismissal be granted. [Doc. 75] On February
9, 2005, **Brown** objected to the Report and Recommendation [Doc.
77] and on the same date he filed a Motion to Reinstate his
complaint. [Doc. 78]

On February 1, 2005, plaintiffs **Augusto Moreira** and **Rafiu
Abimbola** filed a Notice to Join in the Objections to be filed by
plaintiff **Ndaula**. [Doc. 76]

On February 10, 2005 plaintiff **Ndaula** filed a Motion for
Extension of Time to Amend and Supplement his Complaint [Doc.
82], a Motion to Certify Class Action [Doc. 83], and an Objection
to the Second Report and Recommendation [Doc. 84]. In the
objection, plaintiffs **Ndaula**, **Moreira** and **Abimbola** (see Doc. 76)
made the following observations with regard to the Second Report
and Recommendation [Doc. 50]:

1. To the extent that the Report recommended dismissal based
upon the plaintiffs' failure to exhaust administrative remedies
as mandated by the provisions of 42 U.S.C. §1997e(a), it was in
error since the provisions of that statute and other provisions
of the PLRA (Prison Litigation Reform Act) have been held not to
apply to immigration detainees, since these detainees do not fall
within the ambit of the statute's definition of "prisoner." [Doc.
84, pp. 5-7], and,

2. To the extent that exhaustion is mandated, it should be
excused in plaintiffs' case because an effective administrative
remedies procedure has not been afforded to immigration detainees
in the custody of local prisons or detention centers; and,
plaintiffs were hindered by the defendants from utilizing any
administrative remedies procedure that may have been in place.
[id., pp. 7-16]

Further, plaintiffs **Ndaula**, **Moreira** and **Abimbola** re-urged
their objection to the Report's finding that plaintiffs failed to

allege an actual injury and objected to the Report's conclusion that **Ndaula** could not represent the remaining co-plaintiffs. [id. pp. 16-19]

On February 11, 2005, plaintiffs **Curtis Banks**, **Franklin Moreno**, and **Rafiu Abimbola** filed a Motion for an Extension of Time to Object [Doc. 88] to the Report which recommended voluntary dismissal of **Patrick Brown's** claims. [Doc. 75] On March 3, 2005, plaintiff **Ndaula** likewise objected to the voluntary dismissal of **Brown's** claims. [Doc. 93] On March 16, 2005, plaintiffs **Moreno**, **Moreira**, and **Abimbola** joined in **Ndaula's** objection to Brown's voluntary dismissal. [Docs. 94, 95, 96]

On February 17, 2005, Brown filed a Motion to Withdraw his Motion to Dismiss. [Doc. 92]

**F. Judge Drell's September 30, 2005 Judgment [Doc. 97]**

Finally, on September 30, 2005, Judge Drell signed a judgment which:

1. Dismissed without prejudice the claims of plaintiffs **Fredo Gustave**, **Eric Bell**, **Ramit Narang**, **Leroy Bacchus**, and **Hussein Nasrallah** because these plaintiffs failed to notify the court of their respective address changes;

2. Dismissed with prejudice all claims against the Concordia Parish Sheriff's Department;

3. Denied the Motions for Class Certification [Docs. 3 and 83];

4. Granted plaintiff **Patrick Brown's** Motion to Withdraw his motion to voluntarily dismiss his claim [Doc. 92] and made appropriate rulings with respect to the remainder of Brown's Motions [Docs. 78, 88, and 92]; and,

5. Granted the Motion for Extension of Time to file any proposed Amendment to the pleadings and gave all remaining plaintiffs [**Patrick Brown, Franklin Moreno, Rafiu Abimbola, Prince C. Brown, Augusto Moreira, Alexander W. Ndaula,** and **Curtis Banks**] until November 15, 2005 to file their proposed amendments.

## G. Post Judgment Events

Judge Drell's Judgment was mailed to all plaintiffs.

On October 11, 2005, the judgment sent to plaintiff **Prince Brown** at the FDCO was returned with the notation "return to sender." [Doc. 98]

None of the remaining plaintiffs have filed an Amendment to the Complaint.

## LAW AND ANALYSIS

The Report and Recommendation dated July 26, 2004 [Doc. 41] was initially rejected by the court [Doc. 49] based upon plaintiff **Ndaula's** objections filed on October 22, 2004. [Doc. 48] **Ndaula** and the other remaining plaintiffs have been given the opportunity to amend their complaints to cure some of the deficiencies noted in the first Report and Recommendation, however, none of the plaintiffs have filed an amended complaint.

The original Report and Recommendation was withdrawn on December 1, 2004 when the second Report and Recommendation was submitted. [Doc. 50] In light of developments subsequent to December 1, 2004, the undersigned hereby re-instates the first Report and Recommendation with the following additional observations.

### 1. Mootness

None of the remaining plaintiffs are in detention at the CPCF-II. As noted in the original Report and Recommendation [Doc. 41], their transfers render the claims for declaratory and injunctive relief moot as to all claims and all defendants. See Herman v. Holiday, 238 F.3d 660, 665 (5th Cir.2001) (even if inmate was able to establish constitutional violation, his transfer to another prisoner rendered moot his claim for declaratory and injunctive relief) (citing Cooper v. Sheriff, Lubbock County, Tex., 929 F.2d 1078, 1084 (5th Cir.1991)); Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir.1988) (prisoners who were no longer in Retrieve Unit could not seek injunctive relief against conditions of confinement there).

Any suggestion of relief based on the possibility of a transfer back to CPCF-II is too speculative to warrant relief. See Herman, 238 F.3d at 665 (citing Bailey v. Southerland, 821 F.2d 277, 279 (5th Cir.1987)).

In any event, as shown above, plaintiffs have requested

prospective injunctive relief. See <u>Castillo v. Cameron County,</u>
<u>Tex.</u>, 238 F.3d 339, 351 n. 19 (5th Cir.2001) (quoting 18 U.S.C. §
3626(g)(7)) ("The PLRA defines 'prospective relief' as 'all
relief other than <u>compensatory</u> monetary damages.'" See also, <u>Cook</u>
<u>Industries, Inc.</u> <u>v. Carlson</u>, 334 F.Supp. 809, 3 ERC 1799, 2
Envtl. L. Rep. 20,548, (N.D.Miss.1971), ("Nominal Damages are not
actual or compensatory damages.")

    "The transfer of a prisoner out of an institution often will
render his claims for injunctive relief moot" unless he "can show
either a 'demonstrated probability' or a 'reasonable expectation'
that he will be transferred back to the facility." <u>Oliver v.</u>
<u>Scott</u>, 276 F.3d 736, 741 (5th Cir.2002) (quoting <u>Murphy v. Hunt</u>,
455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). See
<u>Wallace v. Texas Tech University</u>, 80 F.3d 1042, 1047 n. 3 (5th
Cir.1996) ("Jurisdiction over a plaintiff's claims for future
relief is appropriate only if a reasonable likelihood exists that
the plaintiff will again be subjected to the allegedly
unconstitutional actions."). Finally, see <u>Edwards v. Johnson</u>, 209
F.3d 772, 776 (5th Cir. 2000) (Alien detainee's claims for
injunctive relief intended to correct policies and practices at
particular detention center were rendered moot when he was
transferred out of that center.)

    None of the remaining plaintiffs have suggested that there
is a reasonable likelihood that they will be transferred back to

CPCF-II.[5]  Therefore, plaintiffs' request for prospective
injunctive relief as to all of their claims should be dismissed
as moot. <u>Bilarski v. Harborth</u>, 55 F.3d 160, 162 (5th Cir.1995).

In addition, and with respect to the specific claims for
relief raised herein by the plaintiffs, as the following
discussion shows, plaintiffs have clearly failed to state claims
for which relief may be granted.

Plaintiff **Ndaula**, in his objection to the Report and
Recommendation filed on October 22, 2004 [Doc. 48] attempted to
expand his complaint to include the "...general detention
practices of the DHS." He argued that dismissal of the complaint
on the grounds of mootness was inappropriate because identical or
similar conditions of confinement were encountered by detainees
who had been transferred to the ECDC in Alabama or to other
detention centers in the south.

However, as shown above, **Ndaula** is no longer in the physical
custody of DHS/ICE and has not been in the custody of that agency
since May, 2004. In fact, it appears that **Ndaula** was not in
custody when he filed the Objection to the First Report and
Recommendation.  Thus, in light of the fact that he has not been
in the physical custody of DHS/ICE, it is clear that plaintiff

---

[5] Indeed, the record herein demonstrates that none of the
plaintiffs have been detained at CPCF-II since April or May,
2004.

**Ndaula's** claims are moot whether he complains about conditions of
confinement at CPCF-II, ECDC, or any other "sub-standard"
facility.

With respect to the claims of those plaintiffs who remain in
DHS/ICE custody at ECDC - plaintiffs **Moreno, Abimbola, Brown,
Moreira,** and **Banks** - despite having been afforded numerous
opportunities to do so, none of these plaintiffs have alleged any
specific claims concerning the conditions of confinement at ECDC.
Plaintiff **Ndaula's** conclusory statements concerning the
conditions of confinement at ECDC remain unsupported by his co-
plaintiffs. These unsupported and conclusory allegations
concerning the conditions of confinement at facilities other than
CPCF-II fail to state a claim for which relief may be granted.

Further, with respect to plaintiffs **Patrick Brown** and **Prince
Brown**, the best evidence suggests that these detainees are now
being, and have for some time been housed at the FDCO in Oakdale.
Plaintiffs' prayed initially for an order directing DHS/ICE to
transfer them to a federal facility. It thus appears that with
respect to the **Plaintiffs Brown**, their requests have been granted
and their claims are clearly moot.

In short, the claims of all remaining defendants are moot
and the dismissal of this complaint on that basis is recommended.

## 2. Access to the Courts/Law Library

Plaintiffs alleged that the CPCF-II Law Library is

inadequate, that they are denied access to the library, and that they are denied typewriters, paper, and pens. Plaintiffs also complained that they were required to submit their legal papers to inmate counsel and that this practice impinged upon their right to privacy. Plaintiffs argued that as a result of these deficiencies, they were denied access to the courts in violation of their rights under the First and Fourteenth Amendments.

As stated in the first Report and Recommendation, in Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the United States Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828. However, this basic rule of constitutional law was subsequently qualified.

As further noted, in Lewis v. Casey, 518 U.S. 343, 348, 116 S.Ct. 2174, 2178, 135 L.Ed.2d 606 (1996), the Court held that an inmate asserting an access to court claim must show that the actions of the defendants resulted in an actual injury, that is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim."

The Court noted that Bounds "...did not create an abstract,

freestanding right to a law library or legal assistance...", and that "...an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense...". Thus, according to the Court, and inmate alleging the denial of access to the courts based upon the inadequacies of the institution's law library "... must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id*. at 351.

Therefore, as previously noted, in the wake of <u>Lewis v. Casey</u>, plaintiffs asserting access to the courts claims must at least allege some general factual allegations of injury resulting from the conduct of the defendants. *Id*. at 358. Further, even in the context of a class action, the named plaintiffs who purport to represent the class must allege and show that they <u>personally</u> have been injured. *Id*. at 357 (citations omitted) Thus, in order to state a claim for relief, all plaintiffs must identify a "nonfrivolous," "arguable" underlying claim which has been "frustrated or was being impeded.". *Id*. at 353.

In short, in order for their access to court claim to remain viable, each of the remaining plaintiffs must describe his underlying cause of action in the complaint with sufficient particularity to give fair notice to the defendant and to enable the court "...to apply the 'nonfrivolous' test and to show that

the 'arguable' nature of the underlying claim is more than hope."
Christopher v. Harbury, 536 U.S. 403, 415-416, 122 S.Ct. 2179,
153 L.Ed.2d 413 (2002).

Here, plaintiffs have failed dismally. Plaintiffs have
demonstrated no injury, either collectively or individually.
Their claim merely asserts that immigration litigation is complex
in nature and that the resources for doing research are
inadequate. Plaintiffs fault the defendants because they "...have
failed to put in place a system that updates vital legal research
materials." [Attachment, p. 1] However, "...the Constitution does
not require that prisoners ... be able to conduct generalized
research, but only that they be able to present their grievances
to the courts..." Lewis v. Casey, 518 U.S. at 360, 116 S.Ct. at
2184.

In his Objection, plaintiff **Ndaula** contended that the
defendants had undertaken a wide variety of measures to deny the
plaintiffs access to the courts. However, as shown above, **Ndaula**
has been out of custody since May, 2004. Clearly the access to
court claim is moot with respect to this plaintiff since he
cannot show that action on the part of any of the defendants has
caused him injury in this regards.

As to the remaining plaintiffs, **Brown, Moreno, Abimbola,
Prince Brown, Moreira**, and **Banks**, none of them have suggested any
specific acts on the part of the defendants which denied them

access to the courts; and, more importantly, none of them have alleged the requisite injury which resulted from the alleged denial.

Notwithstanding plaintiff **Ndaula's** averment to the contrary, a denial of access to the court claim must be supported by allegations showing a concrete injury resulting from the alleged violation. Lewis v. Casey, 518 U.S. 343, 348 (1996.)

Plaintiffs have failed to state a claim for which relief may be granted, and, consequently, their access to court claims should be dismissed with prejudice.

### 3. Denial of the Right to Religious Freedom

Plaintiffs claim that **Eric Bell** and **Patrick Brown** were placed in Administrative Segregation when they refused to cut their hair. **Bell** and **Brown** are Rastafarians and claim that a hair cut would violate their religious tenets. Of course, **Bell's** claim was dismissed on September 30, 2005; therefore any remaining claims asserted by or on behalf of plaintiff **Bell** are now moot.

With regard to **Patrick Brown's** claim it should be noted that in those cases which have analyzed similar prison regulations, the courts have generally found that requiring prisoners to have short hair makes it more difficult for escaped prisoners to alter their appearance from the photographs taken periodically of all inmates. Based upon such findings, the courts

generally have concluded that the institution's interests in promulgating and enforcing grooming policies were compelling, and that these interests could not be achieved without some sort of regulation limiting hair length. See Diaz v. Collins, 114 F.3d 69, 72-73 (5th Cir. 1997); Harris v. Chapman, 97 F.3d 499 (11th Cir.1996); Hamilton v. Schriro, 74 F.3d 1545 (8th Cir.1996).

Prison regulations on hair length are thus related to security and, as such, involve a compelling state interest. Since the security interest at stake cannot meaningfully be achieved appropriately by any different or lesser means than hair length standards, the constitution is not violated when prison officials require inmates to cut their hair. Diaz v. Collins, 114 F.3d, 73 (5th Cir. 1997).

Likewise, plaintiffs' complaint as it relates to the ability of Muslim inmates to attend Friday "Jumah Prayer Service" fails to state a constitutional violation. See, O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("...the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end.")

**Ndaula's** objections to the contrary, none of the plaintiffs have alleged that they have been denied the opportunity to freely exercise their religion. Having been given the opportunity to amend and state a claim, their failure to do so suggests that this claim is without merit. Further, nothing of record even suggests that <u>any</u> of the remaining plaintiffs - **Patrick Brown, Franklin Moreno, Rafiu Abimbola, Augusto Moreira, Alexander W. Ndaula, or Curtis Banks** - are Muslims!

### 4. Denial of First Amendment Right to the Press

Plaintiffs claimed that the prison administration has circulated a memorandum that purportedly bans all publications from the "holding center."

As noted in the first Report and Recommendation, a prisoner retains those First Amendment rights that are consistent with his status as a prisoner or within the legitimate penological objectives of the prison. <u>Hudson v. Palmer</u>, 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); <u>Green v. Polunskey</u>, 229 F.3d 486, 489 (5th Cir.2000).

This standard applies to an inmate's right to receive

publications and general correspondence. See <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 404-19, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (the test regarding a prison regulation allowing prison officials to reject incoming publications found to be detrimental to institutional security is whether it is "reasonably related to a legitimate penological interest"); <u>Turner</u>, 482 U.S. at 84-95; <u>Chriceol v. Phillips</u>, 169 F.3d 313, 315-17 (5th Cir.1999). "Before delivery of a publication may be refused, prison administrators must review the particular issue of the publication in question and make a specific, factual determination that the publication is detrimental" to legitimate penological interests. <u>Guajardo v. Estelle</u>, 580 F.2d 748, 762 (5th Cir.1978).

The Fifth Circuit has held that restrictions on certain material that has the potential to produce violence are rationally related to the valid penological interests of insuring the safety of prison inmates. <u>Chriceol</u>, 169 F.3d at 315-17. Violence-producing material may include, *inter alia*, material that would encourage inmates to strike or riot, material that would encourage racial or religious hatred, *id.*, and material that "provides step-by-step descriptions of the manufacture of weapons, explosives, or drugs...." <u>Guajardo</u>, 580 F.2d at 760. A prison regulation may validly restrict material advocating racial hatred on the basis that it would create a serious danger of

violence. Chriceol, 169 F.3d at 316.

Courts must defer to the judgment of prison administrators regarding prison security. Oliver v. Scott, 276 F.3d 736, 745 (5th Cir.2002). Relying on O'Lone, *supra*, the Fifth Circuit has noted four factors which are relevant for determining the validity of a challenged regulation or practice: (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the rights that remain open to the inmates; (3) the impact that accommodation of the asserted constitutional rights will have on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimus* cost to valid penological interests. Chriceol, 169 F.3d at 316.

"[C]entral to all other goals is the institutional consideration of internal security within the corrections facilities themselves." Pell v. Procunier, 417 U.S. 817, 823 (1974). The security of both inmates and prison employees is a valid penological goal. Hicks v. Garner, 69 F.3d 22, 25 (5th Cir.1995). "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional

security." Whitley v. Albers, 475 U.S. 312, 321-22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Prison officials may rely on the "reasonable person" standard when determining whether a publication can and should be censored. Guajardo, 580 F.3d at 761.

Here, plaintiffs did not allege that any particular publications had been censored; instead, they referred to a memorandum suggesting that publications would be banned. To the extent that the "memo" in question was implemented during their stay at CPCF-II, plaintiffs arguably stated a claim for which relief may be granted. However, as with the access to court claims, the constitutional right alleged to have been violated herein does not exist in a vacuum; civil rights plaintiffs must always allege, in addition to the fault of the defendant, some prejudice suffered as a result of that fault. None of the plaintiffs have alleged the unwarranted censorship of a particular publication. None have alleged that the policy complained of forbade the reception of a publication that would have been received absent the institution of the policy in question. Again, all of the remaining plaintiffs were afforded the opportunity to amend their complaint more adequately state this claim. None availed themselves of this opportunity. Accordingly, the plaintiffs having failed to state a claim for which relief may be granted, the claimed violation of their First

Amendment Rights should be dismissed.

### 5. Conditions of Confinement

Plaintiffs complained about unsanitary or unhealthy conditions of confinement at CPCF-II. None have amended to complain about conditions at their current places of detention.

As noted in the original Report and Recommendation, detainees[6] possess a clearly established constitutional right to be free from punishment. See <u>Bell v. Wolfish</u>, 441 U.S. 520, 534-37, 99 S.Ct. 1861, 1871-73, 60 L.Ed.2d 447 (1979). The Supreme Court has held that a detainee's claims of unconstitutional conditions of confinement are analyzed under the Fourteenth Amendment's guarantee of due process of law as opposed to the Eighth Amendment's prohibition of cruel and unusual punishment, which applies only to sentenced inmates. See *id.* at 535 n. 16, 99 S.Ct. at 1872 n. 16; <u>Hare v. City of Corinth</u>, 74 F.3d 633, 639 (5th Cir.1996). "A 'condition of confinement' case is a '[c]onstitutional attack [ ] on general conditions, practices, rules, or restrictions of pretrial confinement.'" See *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir.1997) (citing <u>Hare v. City of Corinth</u>, 74 F.3d 633, 644 (5th Cir.1996)).

In analyzing the civil rights claims of detainees, the

---

[6] When addressing the rights of immigration detainees, the Fifth Circuit instructs that the court should look to jurisprudence establishing the constitutional rights of pretrial detainees. See <u>Ortega v. Rowe</u>, 796 F.2d 765, 767 (5th Cir.1986).

Fifth Circuit has distinguished between cases challenging specific acts and omissions and those alleging constitutional deprivations by virtue of the general conditions of confinement. See Hare, 74 F.3d at 644. In conditions of confinement cases, the "harm" is said to be caused by the condition itself. "This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." Scott v. Moore, 114 F.3d 51, 53 (5th Cir.1997). The Fifth Circuit has concluded that where a pretrial detainee challenges the general conditions of confinement, as opposed to particular acts or omissions, a constitutional violation exists only if the court finds that the conditions of confinement are not reasonably related to a legitimate, non-punitive governmental objective. See Hare, 74 F.3d at 640 (citing Bell, 441 U.S. at 538-39, 99 S.Ct. at 1873-74); see also Scott, 114 F.3d at 53 (citing Hare ).

Where a detainee's allegations are based on a particular act or omission of one or more officials, the action is characterized as an "episodic act or omission" case. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir.1999); Hare, 74 F.3d at 645. When an individual government official is sued for a specific act or omission, the detainee-plaintiff must allege and establish that the named defendant acted with subjective deliberate indifference to prove a violation of his constitutional rights. Olabisiomotosho, 185 F.3d at 526 (citing

Flores v. County of Hardeman, 124 F.3d 736, 738-39 (5th
Cir.1997)). A prison official acts with subjective deliberate
indifference when he "had subjective knowledge of a substantial
risk of serious harm to a pretrial detainee but responded with
deliberate indifference to that risk." Hare, 74 F.3d at 650. See
also Sibley v. Lemaire, 184 F.3d 481, 489 (5th Cir.1999) ("In
Hare ... we adopted the same deliberate indifference standard for
pretrial detainees as the one articulated by the Supreme Court in
Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811
(1994), for convicted prisoners. "It is, indeed, fair to say that
acting or failing to act with deliberate indifference to a
substantial risk of serious harm to a prisoner is the equivalent
of recklessly disregarding that risk."). Although the courts have
carefully distinguished the conditions of confinement cases from
those cases arising from  specific acts or omissions, they have
also noted that "the reasonable-relationship test employed in
conditions cases is 'functionally equivalent to' the deliberate
indifference standard employed in episodic cases." Scott, 114
F.3d at 54 (citing Hare, 74 F.3d at 643).

Plaintiffs' complaint alleged both episodic acts of
individuals as well as conditions of confinement.

With regard to the general conditions of confinement,
plaintiffs alleged unsanitary living conditions, the denial of
sufficient recreation, exposure to environmental tobacco smoke,

the lack of sufficient toilet and shower facilities, and the
denial of sufficient "extra-curricular" activities.

As to the denial of "extra-curricular" activities, it is
clear that the Constitution does not mandate educational,
rehabilitative, or vocational programs. See Beck v. Lynaugh, 842
F.2d 759, 762 (5th Cir.1988) (citing Newman v. State of Alabama,
559 F.2d 283, 292 (5th Cir.1977), rev'd in part on other grounds
sub nom., Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57
L.Ed.2d 1114 (1978)). Further, an inmate has no right to a job in
the prison or to any particular job assignment. See Ingram v.
Papalia, 804 F.2d 595, 596 (10th Cir.1986); Garza v. Miller, 688
F.2d 480, 485 (7th Cir.1982); Fuller v. Rich, 925 F.Supp. 459,
462 (E.D.Tex.1995). Given that detainees do not have a right to
education or employment while housed at CPCF-II, plaintiffs have
failed to show that the lack of educational and employment
opportunities afforded to immigration detainees is violative of
any constitutional rights.

As to the exposure claim, it is now clear that detainees
have the right to be free from exposure to high levels of
environmental tobacco smoke if it is established that prison
smoking policies amounted to unreasonable risk and deliberate
indifference to his health. See, e.g., Rochon v. City of Angola,
122 F.3d 319, 320 (5th Cir.1997).

The Supreme Court has applied a two-prong test to determine

whether exposure to second-hand smoke violates the Constitution. First, a plaintiff asserting such a claim must prove objectively that he is "being exposed to <u>unreasonably</u> high levels of ETS [Environmental Tobacco Smoke]." <u>Helling v. McKinney</u>, 509 U.S. 25, 35, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993) (emphasis added). In assessing this first factor, the court must conduct an inquiry into the seriousness of the potential harm and into the likelihood that second-hand smoke will actually cause such harm. See *id*. 509 U.S. at 37, 113 S.Ct. at 2482. The court also has to determine "whether society considers the risk ... to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id*. Second, the plaintiff must show that prison authorities demonstrated a "deliberate indifference" to his plight. See *id*.

Here, plaintiffs' claims fail to meet the first prong of the <u>Helling</u> test. Plaintiffs have not alleged that they (either individually or collectively) were exposed to "<u>unreasonably</u> high levels of ETS." *Id*. 509 U.S. at 35, 113 S.Ct. at 2482. Further, plaintiffs did not allege any actual physical impact resulting from their exposure; their request for only "nominal" damages suggests that the exposure did not reach the level of a constitutional violation. See <u>Oliver v. Deen</u>, 77 F.3d 156, 158 (7th Cir.1996) (denying an Eighth Amendment claim by an asthma sufferer who said the smoke caused him to wheeze, gasp for

breath, and suffer from dizziness and nausea). Plaintiffs were given the opportunity to amend their complaint to cure this deficiency, but did not avail themselves of the opportunity.

In addition, plaintiffs' case can be factually distinguished from Helling. The prisoner there shared a cell with another inmate who smoked five packs of cigarettes a day. See id. 509 U.S. at 28, 113 S.Ct. at 2478. Similarly, in two Fifth Circuit cases that have recognized a potential ETS-based Eighth Amendment claim, the exposure to second-hand smoke was substantially more severe and sustained than that alleged by the plaintiffs. See Whitley v. Hunt, 158 F.3d 882, 888 (5th Cir.1998) (the prisoner shared living quarters with a smoker); Rochon v. City of Angola, 122 F.3d 319, 320 (5th Cir.1997) (the inmate was "required to live and work in 'environments filled with tobacco smoke'"). In contrast, plaintiffs do not allege that they are forced to live in a smoke-filled environment. They only allege that there are no designated smoking areas. Society would not necessarily consider this circumstance to "violate [ ] contemporary standards of decency." Helling, 509 U.S. at 37, 113 S.Ct. at 2482.

Likewise, plaintiffs' generalized claims of unsanitary conditions and lack of sufficient restroom facilities fails to state a valid constitutional claim. The Constitution does not mandate "comfortable prisons," (Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). However, the

Fourteenth Amendment does prohibit detainees from being held under inhumane conditions. Plaintiffs' allegations do not suggest that they were forced to endure such inhumane conditions. Their discomfort owing to the conditions of confinement was obviously not such that it required compensation beyond merely nominal damages.

Again, all remaining plaintiffs were given the opportunity to flesh out these claims and to provide further information concerning the deleterious effects of their exposure to tobacco smoke and other unhealthy and unsanitary conditions of confinement. Yet none of the plaintiffs availed themselves of this opportunity.

### 6. Retaliation

Plaintiffs contended that their transfers to CPCF-II were acts of retaliation. Plaintiffs suggested that DHS/ICE officials transferred them to that facility in retaliation for their having asserted their rights in their respective immigration proceedings. They further claimed that detainee **Abimbola** was relieved from his job as inmate counsel in retaliation for having complained of the inadequacies of the facility's law library.

"To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act,

and (4) causation." Jones v. Greninger, 188 F.3d at 324-25. "[I]f the [prisoner] is unable to point to a specific constitutional right that has been violated, the claim will fail." *Id.* at 325. "The [prisoner] must allege more than his personal belief that he is the victim of retaliation," *id.*; rather, he "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred[,]'" Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995) (quoting Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir.1988)). Finally, "causation" requires the prisoner to show that "but for the retaliatory motive the complained of incident ... would not have occurred." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir.1997). "This places a significant burden on the [prisoner]." *Woods v. Smith*, 60 F.3d at 1166.

Here, plaintiffs have offered only conclusory opinions that the defendants had a retaliatory motive. Plaintiffs' "[b]are allegations of malice do not suffice to subject" the defendants "either to the costs of trial or the burdens of broad- reaching discovery." Al-Ra'id v. Ingle, 69 F.3d 28, 33 (5th Cir.1995). Clearly, plaintiffs' conclusory allegations of retaliation are insufficient to establish a constitutional claim for retaliation. See Holloway v. Hornsby, 23 F.3d 944, 945 (5th Cir.1994).

As to the claim of retaliation as it relates to detainee **Abimbola**, as stated above, since a detainee has no right to a job

in the prison or to any particular job assignment, his subsequent

loss of such a job cannot support a claim for retaliation. See

Ingram v. Papalia, 804 F.2d 595, 596 (10th Cir.1986); Garza v.

Miller, 688 F.2d 480, 485 (7th Cir.1982); Fuller v. Rich, 925

F.Supp. 459, 462 (E.D.Tex.1995).

### 7. Physical and Verbal Abuse

Plaintiffs' claimed that a fellow detainee, Norman Butte,

was assaulted by an unnamed prison official and that detainee

Gregario Machvado was assaulted by state inmates. However,

plaintiffs have no standing to assert these claims, since neither

Butte nor Machvado joined as plaintiffs in this litigation.

Likewise, plaintiffs lack standing to complain of the harm

alleged to have been suffered by detainee **Gervaise Blackwood**

since **Blackwood** voluntarily withdrew from this suit and alleged

in his Motion to Withdraw that his fellow detainees named him as

a plaintiff without his consent. See Flast v. Cohen, 392 U.S. 83,

99-100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("The 'gist of the

question of standing' is whether the party seeking relief has

'alleged such a personal stake in the outcome of the controversy

as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends

for illumination of difficult constitutional questions.' In

other words, when standing is placed in issue in a case, the

question is whether the person whose standing is challenged is a

proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.")

As to the claim that detainee **Nasrallah** was denied a copy of the Koran by the prison chaplain, such claim is frivolous.  While prison officials cannot (except under limited circumstances) prohibit the free exercise of religion, they are not required to provide religious material to inmates. See <u>Frank v. Terrell</u>, 858 F.2d 1090 (5th Cir.1988) (quoting the District Court's reasons for judgment which stated, "[t]here cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country." (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 323, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263 (1972) (Burger, C.J., concurring)). Accord, <u>Childs v. Duckworth</u>, 509 F.Supp. 1254, 1264 (N.D.Ind.1981), aff'd, 705 F.2d 915 (7th Cir.1983); <u>Cochran v. Sielaff</u>, 405 F.Supp. 1126, 1128 (S.D.Ill.1976).)

Finally, as to the claim that detainee **Nasrallah** and his religious beliefs were insulted by the prison Chaplain, those allegations fail to state a claim for which relief may be granted since mere allegations of verbal abuse do not present actionable claims under § 1983. See <u>Bender v. Brumley</u>, 1 F.3d 271, 274 n. 4 (5th Cir.1993).

Finally, any claims involving plaintiff **Nasrallah** were rendered moot by his dismissal as a plaintiff from this suit.

## 8. Conclusion

The undersigned hereby re-instates the Report and
Recommendation submitted to the court on July 26, 2004. [Doc. 41]
For the reasons set forth in that Report and Recommendation, and
for the additional reasons set forth herein, dismissal of all
claims against all remaining defendants is recommended.

Therefore,

**IT IS RECOMMENDED** that the civil rights complaints of
plaintiffs **Patrick L. Brown, Franklin Moreno, Rafiu Abimbola,
Prince C. Brown, Augusto Moreira, Alexander W. Ndaula, and Curtis
Banks** be **DISMISSED WITH PREJUDICE** as **MOOT**, and for failing to
state claims for which relief may be granted.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and
Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation
have ten (10) business days from service of this report and
recommendation to file specific, written objections with the
clerk of court. A party may respond to another party's objections
within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual
finding and/or the proposed legal conclusions reflected in this
Report and Recommendation within ten (10) days following the date
of its service, or within the time frame authorized by
Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking
either the factual findings or the legal conclusions accepted by**

the District Court, except upon grounds of plain error. See

*Douglas v. United Services Automobile Association,* 79 F.3d 1415

(5th Cir. 1996).

   **THUS DONE AND SIGNED** in Chambers at Alexandria, Louisiana,

this _____ day of _____

_____, 2005.

                                   JAMES D. KIRK
                                   UNITED STATES MAGISTRATE JUDGE